

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1087 | **DATE** | 9/30/2002 |
| **CASE TITLE** | Coltec Industries, Inc. vs. Zurich Insurance Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [Case No. 99 C 1087 (132-1); Case No. 99 C 3192 (0-1)] is granted. Summary judgment is granted in favor of Coltec Industries, Inc. Status hearing is set for 11/4/02 at 9:30 a.m. to set a scheduling order for the next phase of the instant litigation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 3 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | **SEP 3 0 2002** | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | 9/30/2002 | |
| | Copy to judge/magistrate judge. | | U.S. DISTRICT COURT CLERK | date mailed notice | 145 |
| MD | courtroom deputy's initials | 02 SEP 30 PM 4:05 FILED-EU 30 TO | Date/time received in central Clerk's Office | MD mailing deputy initials | |



DOCKETED

SEP 3 0 2002

| | |
|---|---|
| **COLTEC INDUSTRIES INC.,** ) | **Case No. 99 C 1087** |
| ) | |
| **Plaintiff,** ) | **consolidated with** |
| ) | |
| **vs.** ) | **Case No. 99 C 3192** |
| ) | |
| **ZURICH INSURANCE COMPANY,** ) | **Judge Joan H. Lefkow** |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Coltec Industries Inc. ("Coltec"), seeks coverage for environmental and asbestos claims under six comprehensive general liability ("CGL") insurance policies issued by defendant Zurich Insurance Company ("Zurich") between July 1, 1959 and July 1, 1965. Coltec is engaged primarily in the business of manufacturing precision engineered products. It is incorporated under the laws of Pennsylvania and its principal place of business is in Chapel Hill, North Carolina. Zurich is engaged in the business of selling insurance policies. It is incorporated under the laws of Switzerland and its principal place of business is in Zurich, Switzerland. More than $75,000 is in controversy. This court, therefore, has jurisdiction over the instant action pursuant to 28 U.S.C. § 1332(a)(2). Coltec moves for summary judgment as to the existence and material terms of the Zurich policies. For the reasons set forth herein, the court grants the motion.

# BACKGROUND[1]

Prior to 1959, Coltec was known as Penn-Texas Corporation ("Penn-Texas"). In the mid-1950s, Penn-Texas began to acquire the stock of Fairbanks Morse & Co. ("Fairbanks Morse"), a manufacturer of pumps, scales, generators and locomotives that had been headquartered in Chicago since the nineteenth century. In 1959, Penn-Texas consolidated most of its operations with Fairbanks Morse and changed its name to Fairbanks Whitney Corporation ("Fairbanks Whitney"). Fairbanks Morse remained a Fairbanks Whitney affiliate throughout the early 1960s and became a Fairbanks Whitney wholly-owned subsidiary in 1964. That year, Fairbanks Whitney changed its name to Colt Industries, Inc. ("Colt"). In 1990, Colt changed its name to Coltec.

In 1959, Fairbanks Whitney consolidated its general liability insurance program and that of its subsidiaries and affiliates. After a competitive bidding process, Zurich was selected as the general liability carrier for Fairbanks Whitney and Fairbanks Morse. (Pl. Facts ¶¶ 57, 58.) Zurich issued six CGL policies (Policy Nos. 8055900, 8263000, 8306800, 8261650, 8359650, 8448350) (collectively referred to as the "Zurich policies"), to Fairbanks Morse and Fairbanks Whitney (hereinafter collectively referred to as "Coltec") from July 1, 1959 to July 1, 1965. Neither Coltec nor Zurich, however, has been able to locate the original Zurich policies or copies thereof.

Coltec's claims against Zurich arise from environmental contamination resulting from Fairbank Morse's waste disposal activities in twelve areas in the country. Coltec became

---

[1]References to Coltec's and Zurich's fact statements, briefs and exhibits will proceed with "Pl." and "Def.," respectively.

responsible for the clean-up at these sites. In 1991, Coltec submitted coverage claims for the clean-up costs to Zurich under the Zurich policies. At that time, however, Zurich declined to acknowledge the existence of the Zurich policies. After several years of unfruitful negotiations with Zurich, Coltec filed Civil Action No. 99 C 1087 (the "Environmental Action") in the Northern District of Illinois, seeking a declaration of rights and alleging breach of contract and attorney's fees and penalties.

In the meantime, over 2,000 claimants sued Coltec, alleging that they sustained bodily injury, sickness and diseases as a result of exposure to asbestos products that Fairbanks Morse either manufactured or used. Coltec requested that Zurich assume its defense of these lawsuits under the Zurich policies but Zurich refused. On May 13, 1999, Coltec filed Civil Action No. 99 C 3192 (the "Asbestos Action") in the Northern District of Illinois, seeking a declaration of rights that Zurich was required to defend and indemnify Coltec in the underlying asbestos actions and alleging breach of contract.

On October 18, 1999, the court found the Environmental Action and the Asbestos Action related and consolidated them. The court also divided the instant action in two phases: the current phase deals solely with the existence of the Zurich policies and their terms and conditions; and the next phase addresses whether the Zurich policies cover Coltec's environmental and asbestos claims.

Before the court is Coltec's motion for summary judgment on the current phase.

## DISCUSSION

In order to address Coltec's motion for summary judgment, the court must make the following determinations: (1) whether Coltec demonstrates that it may prove the contents of the

missing Zurich policies under the best evidence rule, Fed. R. Evid. 1001-08; (2) whether the best evidence rule entitles Zurich to a jury trial on Coltec's ability to prove the contents of the Zurich policies; (3) what Coltec's evidentiary burden of proof is to prove the contents of the Zurich policies; and (4) whether Coltec's secondary evidence supports its motion for summary judgment.

A.      **Whether Coltec demonstrates it may prove the contents of the Zurich policies under the best evidence rule**

Proof of the existence and the terms and conditions of the Zurich policies is governed by the best evidence rule under the Federal Rules of Evidence. Fed. R. Evid. 1001-08. Rule 1002 provides that production of the original document is required to prove the contents of a writing. *Remington Arms Co.* v. *Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1426-27 (D. Del. 1992). If the original document (or a copy) is lost or destroyed, then Rule 1004 provides that other evidence of the original's contents is admissible "unless the proponent lost or destroyed them in bad faith." Fed. R. Evid. 1004; *see Neville Constr. Co.* v. *Cook Paint & Varnish Co.*, 671 F.2d 1107, 1009 (8th Cir. 1982) ("[T]he Federal Rules of Evidence recognize no degrees of secondary evidence to prove the contents of a writing that has been lost or destroyed").

To prove the existence and contents of the Zurich policies, Coltec bears the burden of producing the Zurich policies, a copy of the Zurich policies or an explanation for their absence. *See Burroughs Wellcome Co.* v. *Commercial Union Ins. Co.*, 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986) ("*Burroughs I*"), quoting *Time Share Vacation Club* v. *Atlantic Resorts, Ltd.*, 735 F.2d 61, 65 (3d Cir. 1984). Coltec asserts that it must show only that it conducted a "diligent but unsuccessful search and inquiry," *Burroughs I*, 632 F. Supp. at 1223, for the Zurich policies and

"that the search encompassed the areas in which the policies most likely would have been found if they still existed." (Pl. Mem. at 10.) Coltec details how from 1987 until 1998, "Coltec insurance legal personnel, in conjunction with an insurance archeology firm and outside counsel, spent hundreds of hours retrieving and canvassing internal files for any evidence of Coltec's liability insurance coverage." (*Id.* at 10-12.) Nonetheless, Coltec was unable to produce any part of the original Zurich policies or copies thereof. Coltec concludes that this inability to locate the Zurich policies or copies thereof establishes that they are lost and, therefore, it "may prove the existence and content of the missing policies through any competent secondary evidence[.]" (*Id.* at 12.)

In response, Zurich does not argue that Coltec lost or destroyed the Zurich policies in bad faith. Moreover, Zurich does not dispute Coltec's efforts to locate the Zurich policies. Indeed, the court concludes that Coltec's effort is clearly sufficient to show that it conducted a diligent but unsuccessful search and inquiry which encompassed the areas where the Zurich policies would most likely be found. With this finding, Coltec may prove the existence and contents of the Zurich policies under the best evidence rule through any competent secondary evidence.

**B.     Whether the best evidence rule entitles Zurich to a jury trial on Coltec's ability to prove the contents of the Zurich policies**

Although Zurich agrees that Coltec may prove the contents of the Zurich policies under the best evidence rule, Zurich argues that the best evidence rule requires that a jury, and not the court, weigh the evidence. Federal Rule of Evidence 1008 addresses which requirements of Rules 1002 and 1004 are to be apportioned to the court and which are to be apportioned to the trier of fact. *Remington*, 810 F. Supp. at 1423. Rule 1008 provides:

> When the admissibility of other evidence of contents of writings . . . under these rules depends upon the fulfillment of a condition of fact [such as "whether the loss of the originals has been established," Adv. Comm. Notes], the question whether the condition has been fulfilled is ordinarily for the court to determine in accordance with the provisions of rule 104. However, when an issue is raised . . . (c) whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact.

Fed. R. Evid. 1008(c). Rule 1008(c) establishes that Coltec's ability to prove the contents of the Zurich policies requires the "trier of fact" to evaluate Coltec's secondary evidence. However, Zurich relies on Rule 1008(c) to assert that a jury, and not the court, must determine the adequacy of Coltec's secondary evidence to prove the contents of the Zurich policies. Zurich relies on *UNR Indus., Inc.* v. *Continental Ins. Co.*, 682 F. Supp. 1434, 1439 n.5 (N.D. Ill. 1988) (Hart, J.) ("*UNR I*"), a case involving a missing insurance policy where the court determined that the plaintiff-insured was entitled to a jury trial under federal law because although the current phase dealt with insurance coverage questions, the "ultimate relief" sought was money damages.

Since the *UNR I* decision, however, other federal courts have considered the issue of whether the plaintiff-insured or defendant-insurer is entitled to a jury trial subject to the Seventh Amendment on the existence, terms and conditions of lost insurance policies and have concluded otherwise. *See, e.g., Township of Haddon* v. *Royal Ins. Co. of Am.*, 929 F. Supp. 774, 779 (D.N.J. 1996); *J.T. Baker* v. *Aetna Cas. & Sur. Co. & The Hartford Accident & Indem. Co.*, No. Civ. A. 86-4974, 1996 WL 451316, at *16 (D.N.J. Aug. 5, 1996) (Irenas, J.), citing *Township of Haddon*. In *Township of Haddon*, 929 F. Supp. at 779, the court examined the jury trial issue at length and held that because, at common law, most suits to enforce lost instruments were tried in courts of equity, whether the plaintiff-insured established the existence and terms of the lost insurance policy was an equitable issue and, thus, there was no right to a jury trial under the

6

Seventh Amendment. *See also Hogg* v. *Hohmann*, 162 N.E. 209, 213 (Ill. 1928) (at common law, actions to enforce lost instruments were brought in equity until amended by statute to permit jurisdiction in courts of law). The court follows *Township of Haddon* and concludes that neither party is entitled to a jury trial under the Seventh Amendment for this phase. Thus, although Coltec's ability to prove the contents of the Zurich policies is for the trier of fact to decide, the court will decide the issues presented by Rule 1008(c).

### C.    Coltec's evidentiary burden of proof to prove the contents of the Zurich policies

Coltec bears the burden of proving the existence, terms and conditions of the Zurich policies. *UNR I*, 682 F. Supp. at 1448. Zurich admits that it issued a series of six one-year CGL policies to Fairbanks Morse and Fairbanks Whitney, effective from July 1, 1959 to July 1, 1965. (Pl. Ex. 13, Zurich's Resp. to Coltec's First Req. for Admiss. ¶¶ 1-7.) Therefore, Coltec must prove the contents of the Zurich policies, including the relevant exclusions or limitations. *See id.* ("UNR was not required to prove that there was no exclusion of the products hazard from the National Surety policies. Rather, it was required to prove the contents of the lost policies, including an exclusion").[2]

In terms of Coltec's evidentiary burden of proof, Zurich argues that the court must apply state law, that New York law applies, and that, under New York law, Coltec must meet its burden of proof by "clear and convincing evidence." Zurich relies on *Boyce Thompson Inst. for Plant Research, Inc.* v. *Ins. Co. of North Am.*, 751 F. Supp. 1137, 1140-41 (S.D.N.Y. 1990), to argue that the insured must prove the contents of lost policies by clear and convincing evidence

---

[2]Coltec attempts to argue that Zurich must prove the existence and content of any limitations and exclusions. (Pl. Mem. at 16.) However, the *UNR I* decision teaches that this is not so.

under New York law.

Coltec responds that the court need not determine the applicable state law and, if so, then Illinois law applies but that, under either Illinois or New York law, Coltec must meet its burden of proof by a "preponderance of the evidence." Coltec relies on *Gold Fields Am. Corp.* v. *Aetna Cas. & Sur. Co.*, 661 N.Y.S.2d 948, 950 (N.Y. Super. Ct. 1997), where the court found that the *Boyce* court relied on a New York case involving a lost mortgage policy, which dealt "only with lost mortgages and deeds and the inherent strong public policy involved in interests in land." The *Gold Fields* court concluded that because the *Boyce* court relied on no New York cases involving lost insurance policies the *Boyce* court relied on no New York law. The *Gold Fields* court then held that the insured may prove the existence and terms of lost insurance policies by a preponderance of the evidence. Coltec also relies on *Sears, Roebuck & Co.* v. *Seneca Ins. Co.*, 627 N.E.2d 173, 177, 254 Ill. App. 3d 686, 691 (1993), where the court required the insurer to prove an exclusion in the missing insurance policy by a preponderance of the evidence.

In federal courts, the preponderance of the evidence standard is the traditional standard of proof in civil trials from which the courts depart only in circumstances where the danger of fraud is present such as in lost will or oral contract cases. *See, e.g., Remington*, 810 F. Supp. at 1425. Thus, federal courts sitting in diversity apply the preponderance of the evidence standard to lost insurance policy cases because the rationale of preventing fraud is usually absent. *E.g., J.T. Baker*, 1996 WL 451316, at *17; *see also Lincoln Elec. Co.* v. *St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 688 (6th Cir. 2000) (noting the majority of courts adopt the preponderance of the evidence standard for lost insurance policies). Here, Zurich does not contend that Coltec's secondary evidence is tainted by fraudulent conduct. Indeed, most of the evidence comes from

8

Zurich's own files and admissions. *E.g., Remington*, 810 F. Supp. at 1425-26; Fed. R. Evid. 803(6), (7), & (16) (excepting business records from the hearsay rules).

Moreover, Coltec's reliance on *Gold Fields*, 661 N.Y.S.2d at 950, and *Sears, Roebuck & Co.*, 627 N.E.2d at 177, 254 Ill. App. 3d at 691, establish that New York and Illinois appellate courts treat lost insurance policy cases under the same evidentiary standard as the federal courts. Because these cases are only the state appellate courts, however, the court sitting in diversity "must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question." *Allstate Ins. Co.* v. *Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Neither Illinois or New York appellate courts, however, disagree as to the applicable evidentiary burdens and this phase of the litigation concerns mainly evidentiary matters within the purview of the federal courts. *Accord, id.* ("In the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court"); *Barron* v. *Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) ("It is not easy to see what difference th[e application of one state's law over another's] would have made to the outcome of the case; and before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states"); *Remington*, 810 F. Supp. at 1425 (relying on the Federal Rules of Evidence). For these reasons, the court concludes Coltec must prove the contents of the Zurich policies by a preponderance of the evidence.

**D.** **The secondary evidence of the Zurich policies**

Coltec contends that there is no genuine dispute regarding the following material facts:

(1) the Zurich policy form designated 916-F constitutes the material terms and conditions of the 1959-60, 1960-61 and 1961-62 Zurich policies (Policy Nos. 8055900, 8263000 and 8306800, respectively), the existence of which Zurich admits;

(2) the Zurich policy form designated 919-F constitutes the material terms and conditions of the 1962-63, 1963-64 and 1964-65 Zurich policies (Policy Nos. 8261650, 8359650 and 8448350, respectively), the existence of which Zurich admits;

(3) the 1961-62, 1962-63, 1963-64 and 1964-65 Zurich policies contained the standard Zurich "occurrence endorsement";

(4) the effective periods and limits of the respective Zurich policies are: Policy No. 8055900, July 1, 1959 to July 1, 1960, $1 million for bodily injury (person, accident or aggregate) and $1 million for property damage (accident or aggregate); Policy No. 8263000, July 1, 1960 to July 1, 1961, $1 million for bodily injury (person, accident or aggregate) and $1 million for property damage (accident or aggregate); Policy No. 8306800, July 1, 1961 to July 1, 1962, $2 million for bodily injury and property damage (occurrence or aggregate); Policy No. 8261650, July 1, 1962 to July 1, 1963, $2 million for bodily injury and property damage (occurrence or aggregate); Policy No. 8369650, July 1, 1963 to July 1, 1964, $2 million for bodily injury and property damage (occurrence or aggregate); and Policy No. 8448350, July 1, 1964 to July 1, 1965, $2 million for bodily injury and property damage (occurrence or aggregate); and

(5) the Zurich policies contained no endorsement that would limit or defeat coverage for asbestos or pollution claims.

*1.    Summary judgement standards*

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking

10

summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255.

On a motion for summary judgment, the court is not the "trier of fact" and "it can only determine whether there are issues to be tried." *Burroughs Wellcome Co.* v. *Commercial Union Ins. Co.*, 642 F. Supp. 1020, 1022 (S.D.N.Y. 1986) ("*Burroughs II*"). Summary judgment on the existence, terms and conditions of missing insurance policies, however, is appropriate where (1) the insured is not entitled to a jury trial on the issue and, therefore, the court will ultimately resolve the questions of fact regarding the policies' existence and their terms and conditions either on summary judgment or during a bench trial. *Id.* Furthermore, summary judgment is appropriate where the court may determine the policies' existence, terms and conditions by assessing the insured's documentary evidence and testimony of witnesses unless the court must assess the credibility and demeanor of witnesses. *See id.*

Here, the court is the trier of fact and, therefore, will determine the questions of fact

regarding the terms and conditions of the Zurich policies. Moreover, Coltec requests this court to review mainly documentary evidence and the testimony of witnesses who testify as to the contents of these documents. Zurich contends that the instant case requires the court to assess the weight of Coltec's evidence and to find the evidence insufficient to prove the terms and conditions of the Zurich policies. Zurich does not argue that the instant case requires the court to assess the credibility and demeanor of the witnesses with the exception of one witness, John J. Stetina ("Stetina"), the former Insurance Manager for Colt. However, for reasons set forth below, the court disregards those portions of Stetina's testimony that require the court to make a credibility determination and concludes that Coltec establishes the terms and conditions of the Zurich policies by a preponderance of the evidence. As such, summary judgment is appropriate in the instant case.

2.   *The secondary evidence*

Coltec asserts that its secondary evidence, taken as a whole, establishes that the terms and conditions of the Zurich policies are materially identical to Zurich's standard (pre-printed) CGL policy forms and that Zurich offers no evidence to rebut Coltec's proof. (Pl. Mem. at 20.) To support this assertion, Coltec offers the following secondary evidence: (1) Zurich's standard CGL policy forms during the 1959 - 1965 time period; (2) the certificates of insurance for the Zurich policies; (3) a 1962 memorandum written by a Fairbanks Whitney employee (the "Hayward memorandum"); (4) Zurich's loss history evidence; and (5) the testimony of Stetina.

In response, Zurich points out that during the 1959 - 1965 time period it offered not only policies written on its standard CGL policy forms but also modified standard CGL policies with standard or manuscript endorsements as well as manuscript policies. Zurich argues that, based on

the size of the Fairbanks Whitney account and the volume of premiums, the Zurich policies were most likely manuscript policies tailored to the specific needs of the insured. Because Zurich asserts that the Zurich policies were manuscript policies rather than standard CGL policies, Zurich contends that Coltec's secondary evidence "does not speak to the terms and conditions in the missing" Zurich policies and that "[a]t best, such evidence supports Coltec's contention that the missing [Zurich] policies existed at one point in time." (Def. Resp. at 17.)

a.    *Zurich's standard CGL policy forms from 1959 - 1965*

During the 1959 - 1965 time period, in virtually every jurisdiction Zurich was a regular subscriber to the rating and policy writing services of the National Bureau of Casualty Underwriters ("NBCU") for CGL insurance. *See American Home Prods. Corp.* v. *Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1500-03 (S.D.N.Y. 1983, *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984)) (discussing central role of the NBCU and the Mutual Insurance Rating Bureau ("MIRB") in developing and revising the standard CGL policy forms). As a NBCU subscriber, Zurich had to follow the CGL policy forms in a jurisdiction unless Zurich applied for and received approval to use a variance from those forms. (Pl. Facts ¶ 90.)

Between 1959 and 1965, Zurich used three standard CGL policy forms, numbered 916, 917 and 919 as well as manuscript policies and endorsements. The 917 form was issued and sold exclusively on the West Coast and, therefore, is not at issue in the instant case. The 916 form provided "pure" or "monoline" CGL coverage, that is, CGL coverage standing alone. The 919 form combined CGL and automobile liability coverage into a single policy.

In addition to the form number, Zurich identified its policy forms by a letter suffix, which indicated successive editions of the same basic form. The different editions and reprintings of

the 916 and 919 forms were identical, with the exception of editorial changes necessary to add auto liability coverage to the 919 form. (*Id.* ¶ 99; Pl. Ex. 12, Merkel Dep. at 157.) Between November 1957 and September 1961, when Zurich issued the first three Zurich policies to Coltec, Zurich used the 916-F form to write "monoline" CGL policies. (Pl. Facts ¶ 101.) During the period when Zurich issued the last three Zurich policies to Coltec, Zurich used the 919-F form to write "combined" CGL and auto liability policies. (*Id.* ¶ 103.)

The 916-F and 919-F forms provided coverage for "all sums" the insured was, or is, legally obligated to pay as damages because of "bodily injury, sickness or disease" or "injury to or destruction of property . . . caused by accident." (*Id.* ¶¶ 84, 106.) The 916-F and 919-F forms also provided, *in haec verba* with the NBCU standard CGL policy form, that Zurich would "defend any suit" against the insured seeking damages for bodily injury or property damage, "even if such suit is groundless, false or fraudulent." (*Id.* ¶¶ 85, 87.) Moreover, Zurich's documents indicate the CGL coverage in the 916-F and 919-F forms was "designed to automatically cover business operations . . . for all general liability hazards existing at the inception date of the policy and arising during the policy period unless specifically excluded by the exclusions of the policy or by endorsement." (*Id.* ¶ 108.)

Furthermore, during the 1959 - 1965 time period Zurich also offered an "occurrence" endorsement, which changed the basic CGL coverage grant by deleting the phrase "caused by accident" and replacing it with "caused by occurrence" in its standard CGL policy forms. (*Id.* ¶ 109.)[3] In addition, insurers operating in the United States did not exclude coverage for liability

---

[3]Most major insurers offered such occurrence endorsements to major commercial insureds during this period and the "occurrence" terminology was incorporated by the NBCU into the standard CGL policy form when it was next revised in October 1966. *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage*
(continued...)

claims arising from asbestos or pollution injury and neither the 916-F or 919-F form contained

such exclusions. (*See* Pl. Ex. 154, Stewart Decl. ¶¶ 31-32, 36;[4] Pl. Ex. 96, Zurich Policy and

Endorsement Manual II at ZUR 7151-7271.)

According to Coltec, the secondary evidence demonstrates that the first three CGL

policies issued by Zurich to Coltec (effective from July 1959 to July 1962) were monoline CGL

policies written on the 916-F form and the last three Zurich CGL policies (effective from July

1962 to July 1965) were combined CGL and auto liability policies written on the 919-F form.

(*See* Pl. Facts ¶¶ 17, 23, 29, 35, 41, 47, 102, 104); *e.g., Burroughs II*, 642 F. Supp. at 1023

(granting summary judgment for insured because sample policies along with testimonial evidence

established terms of missing insurance policies); *Safeco Ins. Co. of Am.* v. *Great Am. Ins. Co.*,

Civ. No. 87-664, Order at 25-56 (Juba, Mag. J.) (same), *reprinted in Mealey's Litig. Rep. Ins.*

(Vol. 4, No. 21, Sept. 5, 1990). Coltec contends that Zurich offers no evidence to suggest

otherwise.

In response, Zurich concedes that its own standard CGL policy forms were materially

identical to the NBCU's CGL policy form and that there is no evidence that Zurich developed its

own unique CGL policy form for use during the 1959 - 1965 time period. Nonetheless, Zurich

argues that its use of standard CGL policy forms does not demonstrate that the Zurich policies

were such policies. Instead, Zurich contends that the record "demonstrates the liability policies

issued by Zurich during the 1959 - 1965 time frame were not exclusively form policies" but also

---

[3](...continued)
*Disputes* § 8.03[a], at 432 (10th ed. 2000).

[4]Richard E. Stewart ("Stewart") is a former state insurance commissioner and an expert on the drafting
history and regulatory approval of CGL policy forms.

that it "used manuscript policies and numerous standard and manuscript endorsements to tailor its policies to meet the needs of its insureds." (Def. Resp. at 18.) Zurich states that "there is no credible evidentiary link between Zurich's use of form policies and the content of the missing policies that were actually issued to" Coltec. (*Id.* at 18-19.)

In support of its assertions, Zurich relies on cases where the courts applied mainly the clear and convincing standard and the insurer produced affirmative evidence that the specific policies at issue were not standard form policies. *See Keene Corp.* v. *Ins. Co. of North Am.*, Civ. A. No. 78-1011, 1981 WL 1753 (D.D.C. Jan. 30, 1981) (Green, J.) (applying clear and convincing standard and granting summary judgment for insurer because "secondary testimonial and documentary evidence indicated that products liability coverage was not available"); *Maryland Cas. Co.* v. *W.R. Grace & Co.*, No. 88 Civ. 2613, 1996 WL 169326, at *2 (S.D.N.Y. Apr. 11, 1996) (Martin, J.) (applying clear and convincing standard and granting summary judgment for insurer because insured did not provide an explanation for the absence of the missing policy and insurer submitted pages from missing policy, which showed the policy was a standard form policy excluding insurer's defense cost obligations); *State of New York* v. *Union Fork & Hoe Co.*, No. 90-CV-688, 1992 WL 107363, at *6 (N.D.N.Y. May 8, 1992) (McCurn, J.) (applying clear and convincing standard and denying the plaintiff-insured's motion for summary judgment because the defendant-insurer produced evidence that created a factual dispute as to whether the terms of the standard form policies proffered by the plaintiff were the same as the terms of the missing policies); *Thomas Solvent Co.* v. *Continental Cas. Co.*, No. 192210 (Mich. Ct. App. May 19, 1998), *reprinted in Mealey's Litig. Rep. Ins.* (Vol. 12, No. 30 June 16, 1998) (per curiam) (affirming the trial court's finding that the plaintiffs failed to prove the terms of the

missing policies because the evidence indicated that the policies could have come from "numerous different forms, endorsements and schedules").[5]

As affirmative evidence, Zurich produces the deposition testimony of several witnesses, the most informative being that of Rudolph J. Zwolfer ("Zwolfer"), Zurich's expert. (Def. Resp. at 28-29.) Zwolfer was an underwriter for Zurich from 1957 until 1992, when he retired. Zwolfer reviewed Coltec's secondary evidence and concluded that it was insufficient to determine the terms and conditions of the Zurich policies. (Def. Ex. A, Zwolfer Dep. at 174.) Significantly, Zwolfer noted that it had been Zurich's custom and practice during the late 1950s and early 1960s to tailor or modify its insurance coverage to meet the needs of a particular insured.

In response, Coltec points to two manuscript policies which Zurich issued to other insureds around the same time period Zurich issued the Zurich policies. Although this evidence supports Zwolfer's testimonial evidence that Zurich used manuscript policies, the two policies show that, even with the manuscript policies, Zurich used standardized terms to write its CGL policies in the 1959 - 1965 time period. The manuscript policies also include *additional* coverage grants beyond the basic bodily injury and property damage coverage of the standard CGL policy forms. (Pl. Facts ¶ 120.)[6] Furthermore, Zwolfer testifies that manuscript policies

---

[5]*Boyce*, 751 F. Supp. at 1140-41, on which Zurich relies, is unpersuasive because the *Boyce* court merely denied the insured's motion for summary judgment as premature on the basis that additional discovery was needed to determine if the contaminated site was covered by the policy and, if so, whether the contamination occurred during the activities covered by the policy.

[6]The bodily injury and property damage coverage grants of these manuscript policies are identical to those in the 916 form, except that they are written on an "occurrence" basis. (Pl. Facts ¶ 118.) The definition of "occurrence" in these policies is the same as Zurich's standard occurrence endorsement. (*Id.* ¶ 119.) Moreover, Zwolfer testified that Zurich always used its preprinted forms to write combined CGL and auto liability policies. (Pl. Ex. 14, Zwolfer Dep. at 111-12.) The last three Zurich policies were combined CGL and auto liability policies.

17

were rare and even a typewritten (as opposed to pre-printed) CGL policy would have included a broad insuring agreement like that included in the industry's standard CGL policy forms. (*Id.* ¶ 121; Pl. Ex. 14, Zwolfer Dep. at 107-11, 199.) Indeed, the manuscript policies show that because of the competition for providing CGL policies during the 1959 - 1965 time period, the manuscript policies, to the extent Zurich issued them, provided coverage at least as broad as the industry's standard CGL policy form and often provided additional coverage. (Pl. Ex. 154, Stewart Decl. ¶ 18; Pl. Ex. 62, Stewart Dep. at 49-60.)[7]

Zurich offers only testimonial evidence to assert that the Zurich policies *might* be manuscript policies or have standard or manuscript endorsements. However, the testimonial evidence along with the documentary evidence establishes that, at the very least, Coltec received the same CGL coverage according to the 916-F and 919-F forms and possibly more coverage under manuscript policies, which incorporated and added to the standard CGL policy terms and conditions, and that the Zurich policies contained no pollution or asbestos endorsements. *Cf. Eastern Enters.* v. *Hanover Ins. Co.*, No. Civ. A MICV93-01448, 1995 WL 499386, at *2 n.17 (Mass Super. Ct. Aug. 18, 1995) (Cratsley, J.) ("While Hanover argues that the issuance of a 'manuscript' policy might have altered the standard terms to reflect special circumstances unique to the insured it has put forth no evidence in support of the proposition."). As such, the secondary evidence supports that, at a minimum, the Zurich policies were written on Zurich's

---

[7]Even assuming the Zurich policies were manuscript policies, Coltec demonstrates that Zurich policies provided, at a minimum, standard CGL coverage and contained no pollution and asbestos endorsements. Zurich concedes that the Zurich polices were placed with it only after a competitive bidding process among insurers and that, because of intense competition in the insurance industry during this period, insurers typically did not compete by varying and could not compete by restricting the standard CGL policy language. (Def. Resp. to Pl. Facts ¶¶ 58, 80; *see also* Pl. Ex. 154, Stewart Decl. ¶ 18). Given the nature of the market for CGL policies during the 1959 - 1965 time period, Zurich offers no affirmative evidence to rebut Coltec's evidence that the Zurich policies would have provided less then standard CGL coverage and would contain pollution and asbestos endorsements.

standard CGL policy forms.

b.    *The certificates of insurance*

A certificate of insurance ("certificate") is a document, created or authorized by an insurer, that is provided to third parties doing business with an insured to demonstrate the type and extent of insurance coverage the insured has purchased. (Pl. Facts ¶ 122.) During discovery, Coltec located twelve certificates on the Zurich policies. (Pl. Exs. 102-13.) Each certificate features a printed introductory paragraph stating that the policies identified in the body of the certificate "have been issued" by Zurich and provide the "kind of insurance" identified in the certificate. (Pl. Facts ¶ 133.) Each describes the Zurich policy in question as a "Comprehensive General Liability" policy. (*Id.* ¶ 134.) The certificates set forth the policies' effective dates and applicable limits. (*Id.* ¶ 125.)[8]

Coltec contends that Zurich has identified no evidence to contradict what the certificates show: that Zurich issued standard CGL policies and that the last four Zurich policies were endorsed from "accident" to "occurrence" coverage. Further, Coltec argues that the certificates along with the corroborating evidence show that the first three policies were monoline CGL policies and the last three policies were combined CGL and automobile liability policies. (Pl. Facts ¶ 136.)

Zurich responds that the certificates do not contain any information to link the policies

---

[8]No certificate has been located that indicates the limits for the 1960-61 Zurich policy. However, the evidence shows that Coltec obtained $1 million in coverage in 1959-60 and $2 million in coverage for each policy period from 1961-62 until 1964-65. Zurich's corporate designee, Mary Merkel ("Merkel"), admitted that Zurich's premium ledger demonstrates that none of the Zurich policies provided less than $1 million in coverage. (Pl. Facts ¶¶ 24, 25.) The evidence, therefore, demonstrates that the 1960-61 policy provided, at a minimum, $1 million coverage for bodily injury and property damage. *See, e.g., Americhem Corp.* v. *St. Paul Fire & Marine Ins. Co.,* 942 F. Supp. 1143, 1146 (W.D. Mich. 1995) (evidence concerning limits of other policies relevant to determining the limits of missing policy).

memorialized in the certificates with a particular policy form, modified policy form or manuscript policy, and that the certificates do not identify any endorsement used to modify coverage. Specifically, Zurich points to disclaimers on the certificates which indicate that the coverage was "subject to the terms and conditions" of the subject policy. (Def. Resp. at 23.)

In support of its assertions, Zurich relies on *UNR Indus., Inc.* v. *Continental*, No. 85 C 3532, 85 C 2523, 1988 WL 121574, at *6-7 (N.D. Ill. Nov. 9, 1988) (Hart, J.) ("*UNR II*") and *Maryland Cas. Co.* v. *W.R. Grace & Co.*, No. 83 Civ. 7451, 1995 WL 562179, at *6-10 (S.D.N.Y. Sept. 20, 1995) (Bernikow, Mag. J.), to argue that the certificates are inadequate to prove the terms and conditions of the Zurich policies. In *UNR II*, the court reached the issue of whether the certificates showed that the missing policy included contractual liability coverage after the jury had already determined that the plaintiff-insured could not prove the terms of the missing policy. The plaintiff produced three certificates: the first two showed that the missing policy included contractual liability coverage but the third one did not indicate it had such coverage. Plaintiff's own expert had previously testified that the third certificate was prepared last and was the most complete and reliable. As such, the court concluded the plaintiff's own evidence did not support its assertion that the missing policy included contractual liability coverage. In *Maryland Cas. Co.*, the court examined secondary evidence to establish insurance policies from 1953 - 1961, 1961 and 1967. Applying the clear and convincing standard, the court held that the insured proved the existence, terms and conditions of the 1967 policy after reviewing the certificates and other documentary evidence and found that the defendant-insurer presented no evidence to contradict or undermine the insured's evidence. The court further held that the plaintiff established the existence, terms and conditions of the 1961 policy. Nonetheless,

the court held that the testimonial and documentary evidence was insufficient to establish the existence, terms and conditions of the 1953 - 1961 policies although it was sufficient to establish the existence, terms and conditions of the 1967 and 1961 policies.

Zurich's reliance on *UNR II* and *Maryland Cas. Co.* is unavailing because Zurich offers no evidence to undermine the probative value of the certificates at issue here. Moreover, *Maryland Cas. Co.* supports Coltec's use of the certificates because the court held that the plaintiff established the existence, terms and conditions of the 1967 policy through using the certificates and other documentary evidence.

The certificates confirm that the Zurich policies are materially identical to Zurich's standard CGL policy forms. Zurich admits that the certificates "were developed to provide businesses a convenient means of demonstrating to third parties that they had sufficient insurance to cover specific risks" and "enabled insureds to indicate the existence and basic terms of their coverage in a short-hand manner without having to provide a copy of the entire policy." (Def. Resp. to Pl. Facts ¶¶ 129, 130.) Moreover, Zwolfer testified that the certificate's purpose would be compromised if the certificate failed accurately to capture the terms and conditions of the subject policy. (Pl. Ex. 14, Zwolfer Dep. at 197.) Zwolfer also testified that the certificates should have noted the existence of a pollution exclusion, if one existed. (*Id.*) No such pollution exclusion is listed on the certificates. (Def. Resp. to Pl. Facts ¶ 133.) Zurich further concedes that the certificates accurately list the policy numbers, effective dates and applicable policy limits of the Zurich policies. (Def. Resp. to Pl. Facts ¶¶ 125, 128.) Each of the certificates also specifies the "kind of insurance" issued by Zurich, which is identified in each certificate as a "Comprehensive General Liability" policy. (Pl. Ex. 14, Zwolfer Dep. at 104-05, 113-16, 128-

21

29.)

In sum, the certificates point to a conclusion that the Zurich policies were written on standard CGL policy forms and included no pollution endorsement, and that the last four Zurich policies included Zurich's standard occurrence endorsement.

c.    *The Hayward memorandum*

Coltec produces a memorandum, dated November 28, 1962 and written by Dana W. Hayward (the "Hayward memorandum"), a Fairbanks Whitney employee who had insurance duties during the 1960s. (Pl. Ex. 20, Stetina Dep. at 161-63.)  The Hayward memorandum summarizes Fairbanks Whitney's major insurance policies in effect as of 1962 as follows:

> Zurich Insurance Company
>
> General Liability policy #8261650  - 7-1-62 - 7-1-63
>
> Automobile Liability pol. #8261650 - 7-1-62  - 7-1-63
>
> Workmen's Compensation pol. #2353220  - 7-1-62  - 7-1-63
>
> The Workmen's Compensation policy pays the usual statutory limits and the liability policy has broad coverage of $2,000,000.  These policies were placed with Zurich after an intensive review in 1959 in which bids were asked from major stock companies, mutual companies and self-insuring consultants.  It is a *master* policy for all Fairbanks Whitney Companies and written in such a fashion that the Companies enjoy the favorable aspects of a retrospective plan without being required to deposit the full *manual premium*.  We have world-wide coverage, products liability, vendor's endorsement, personal injury, malpractice and occurrence endorsements.  Pratt & Whitney's premium is $53,280.

(Pl. Ex. 10, Hayward Memo at ZUR 6500.) (emphasis added.)

Coltec asserts that the Hayward memorandum establishes that the Zurich policies are standard CGL policy forms covering all of Fairbank Whitney/Fairbanks Morse concerns.  Coltec also points to the term "manual premium" to argue that the Zurich policies provided standard

CGL coverage because they were manually rated according to the NBCU manual.

Zurich responds that the Hayward memorandum has limited value because it discusses only the 1962-63 policy and it contains no description of the policy language and no identification of whether the policy is a form or manuscript policy or descriptions of endorsements that may have been incorporated into the Zurich policies. (Def. Resp. at 26.) Zurich also disputes Coltec's reference to the term "manual premium" as probative of whether all policies manually rated were standard CGL policies.

The court finds that the Hayward memorandum confirms that (1) Zurich became Coltec's CGL carrier in 1959 (Pl. Facts ¶ 138); (2) the Zurich CGL policies were "master" policies covering all Fairbanks Whitney concerns (*id.* ¶ 139); and (3) the 1962-63 policy was a "combined" CGL and auto liability policy with a single policy number (*id.* ¶ 140). Furthermore, although Zurich disputes Coltec's use of the term "manual premium," Zurich admits that the Zurich policies were "manually rated." (Def. Resp. to Pl. Facts ¶ 141.) "Manual rating" means that premiums were calculated by using an NBCU manual created for pricing standard CGL policies. (Pl. Ex. 12, Merkel Dep. at 37-38, 262-63.) Mary Merkel ("Merkel"), Zurich's corporate designee, testified that Zurich did not use manual rates for manuscript policies, stating:

> Q:    How was Zurich able to accurately rate CGL policies at the time if it manuscripted policies?
>
> A:    Well, if it was a manuscript policy, you usually relied on one of the other two methods of rating, the three methods, the manual rating, the A rating or the loss rating. So if it was a manuscript policy, you didn't use the first method.

(Pl. Ex. 12, Merkel Dep. at 75.) The use of manual rates for the Zurich policies, therefore, demonstrates that, whether pre-printed or typewritten, the Zurich policies contained the standard

CGL terms. As such, the Hayward memorandum lends further support that the Zurich policies, in particular the 1962-63 policy, offered standard CGL coverage.

d.    *Loss history evidence: the premium ledger and loss history cards*

Coltec produces Zurich's premium ledger and loss history cards as evidence that Coltec paid premiums for the Zurich policies in full and that Zurich defended bodily injury and property damage claims under the Zurich policies.

i.    *The premium ledger*

Zurich's premium ledger contains information on each of the Zurich policies. It lists the policy number and effective dates for each policy, indicates that Fairbanks Whitney was a named insured,[9] and records the various states in which Fairbanks Whitney and Fairbanks Morse had operations. (Pl. Facts ¶ 144.)

The premium ledger also indicates that the first three Zurich policies were of the policy series "CG." (*Id.* ¶ 145.) Merkel testified that although she did not know the meaning of the "CG" designations, the series "CG" refers to the 916-F form. (*Id.* ¶ 146; Pl. Ex. 12, Merkel Dep. at 555-58.) The premium ledger lends support to Coltec's position that the Zurich policies provided the basic industry-wide standard CGL coverage. *Accord Star Oil Co., Inc.* v. *Aetna Cas. & Sur. Co.*, No. 93-CV-72686, 1995 WL 875597, at *6 (E.D. Mich. June 14, 1995) (Edmunds, J.) (relying on testimony that prefix "LC" signified policy was CGL policy to

---

[9]Fairbanks Whitney appears at the top of the premium ledger and is crossed off and replaced with the name Colt.

determine type of coverage provided).[10]

The premium ledger also demonstrates that the premiums for the Zurich policies were paid in full. The premium ledger records the premium payments that were made to Zurich for each of the Zurich policies, and indicates that Zurich "audited" the premium payments made for each policy year. (Pl. Facts ¶¶ 143, 147, 155.)[11] As such, the premium ledger shows that Zurich paid its premiums in full.

ii.    *Loss history cards*

A series of loss history cards (appended to the premium ledger) list the policy numbers and effective dates of the Zurich policies, record numerous bodily injury and property damage claims submitted under the Zurich policies, and indicate the payments Zurich made on those claims. (Pl. Facts ¶ 149.)

The detailed claims information recorded in the loss history cards includes the name of each claimant and the claim number assigned by Zurich. Each of the claim numbers recorded under the first three Zurich policies begins with the number "9," which demonstrates that the claim was submitted under a general liability policy. (Pl. Facts ¶¶ 151-53.) By contrast, the claim numbers recorded under the last three Zurich policies begin either with a "9" or with a "4,"

---

[10]Zurich disputes Coltec's reliance on the notation "CG" to assert that the Zurich policies were written on standard CGL policy forms. Zurich contends that Merkel conducted an internal investigation to determine the meaning of the "CG" notation and was unable to link the "CG" notation with any specific liability policy language or policy form. (Def. Ex. H, Merkel Dep. at 105-06). However, although Merkel initially claimed that the term "CG" did not "have meaning" for her (*id.*), she later testified that "CG" signified CGL policies. (Pl. Ex. 12, Merkel Dep. at 555-58.)

[11]Zurich argues that the premium payments are insufficient to prove the terms and conditions of the Zurich policies, citing *Boyce*, 751 F. Supp. at 1140-41. The premiums ledgers show that had Coltec not paid the Zurich policies in full, Zurich would not have continued to provide Coltec with a defense for underlying bodily injury and property damage claims after the expiration of the last Zurich policy. (Pl. Facts ¶ 148); *cf. Gold Fields*, 661 N.Y.S.2d at 951 (finding audit of final policy year sufficient to show that the premiums for all prior periods were paid).

the number Zurich used to denominate an auto liability claim. (*Id.*) The loss history cards, therefore, are further proof that the first three policies were written on the 916 form and that the last three Zurich policies were written on the 919 form. (*Id.* ¶ 150.)

The loss history cards also confirm that Zurich acknowledged and defended Coltec against claims involving bodily injury and property damage covered by the Zurich policies. (Pl. Facts ¶ 154.) Evidence that an insurer paid claims under a missing policy and issued policies based on NBCU standard policy forms is probative of the existence and terms of a missing policy. *See, e.g., Gold Fields*, 661 N.Y.S.2d at 951-52. That evidence is abundant in the instant case. Based on the loss history cards, the court finds that Zurich defended Coltec against bodily injury and property damage claims.

e.     *The testimony of John J. Stetina*

John J. Stetina ("Stetina") was Insurance Manager for Colt from 1967 to 1970. He replaced R. B. Myers, the Insurance Manager for Fairbanks Morse/Fairbanks Whitney and the individual who procured the Zurich policies. Stetina was responsible for procuring CGL coverage, monitoring third-party liability claims and submitting such claims to the insurers. Because of his responsibilities, Stetina became familiar with the standard CGL policy form used throughout the insurance industry during the 1959 - 1965 time period.

Coltec asserts that Stetina's testimony establishes that the Zurich policies were written on Zurich's standard CGL policy forms that it used between 1959 and 1965. In support of its assertions, Coltec cites testimony of Stetina that (1) he reviewed the 1963-64 and 1964-65 Zurich policies; (2) those two policies were written on Zurich's standard policy forms for combined CGL and automobile liability coverage; (3) the policies were endorsed to provide coverage on an

"occurrence" basis; (4) the policies did not contain endorsements or exclusions that limited or modified coverage for pollution or asbestos claims; and (5) the policies provided general liability coverage for all Fairbanks Morse and Fairbanks Whitney subsidiaries and divisions. Coltec cites cases where courts relied on the testimony of persons who have personal knowledge of the content of the missing policies to establish the lost insurance policies' terms and conditions and where their testimony was supported by corroborating documentary evidence. *E.g.*, *Bituminous Cas. Corp.* v. *Vacuum Tanks, Inc.*, 75 F.3d 1048, 1052 (5th Cir. 1996).

In response, Zurich concedes that Stetina reviewed the 1963-64 and 1964-65 Zurich policies, that he corresponded with Zurich regarding bodily injury and property damage claims, and that Zurich acknowledged and defended those claims. (Def. Resp. to Pl. Facts ¶¶ 63, 66-67, 74-75.) Nevertheless, Zurich asserts that Stetina's testimony is speculative and creates a credibility issue for the trier of fact because his testimony is based on his review of numerous insurance policies and events from more than 30 years ago. Zurich points to Stetina's failure to recall certain facts such as the insured named on the 1963-64 policy, the name "Fairbanks Whitney," and the number and content of the endorsements. (Def. Ex. L, Stetina Dep. at 56, 60-61, 68.)

To support its arguments, Zurich relies on *Harrow Products, Inc.* v. *Liberty Mutual Ins. Co.*, 64 F.3d 1015, 1020-21 (6th Cir. 1995), a missing insurance policy case where the plaintiff-insured offered only a four page affidavit by a former employee. The court recognized that the employee testified that his responsibilities were to procure insurance coverage, that he always purchased the insurer's "liability policies," that the insurer "insured all of the facilities, and the policies . . . had no riders or exclusions." *Id.* at 1021. The court stated, "We do not doubt [the

27

employee's] veracity, since to do so would violate the well-established standards for considering summary judgment" but determined that the employee did not testify as to the contents of the policies, the scope and amount of coverage, the various rights and responsibilities of the parties or the notification requirements. *Id.*

Here, Stetina's testimony, to a degree, establishes the link missing in *Harrow* because he testifies that he reviewed the 1963-64 and 1964-65 Zurich policies and there is sufficient corroborating evidence including Zurich's own files and Zurich's own admissions to support his testimony that Zurich defended Coltec's bodily injury and property damage claims pursuant to the 1963-64 and 1964-65 Zurich policies. Although the fact that Stetina could not recall the named insured or Fairbanks Whitney is of some significance, Stetina recalls and the corroborating evidence supports that he submitted claims on behalf of Colt, the successor company to Fairbanks Whitney/Fairbanks Morse, to Zurich.[12] These claims concerned product liability lawsuits including those involving bodily injury and property damage suits and Zurich assumed Colt's defense under the Zurich policies. Zurich does not dispute this portion of Stetina's testimony and Coltec has corroborating evidence to support his testimony. Therefore, the court deems this portion of Stetina's testimony proves that the Zurich defended Coltec's bodily injury and property damage claims pursuant to the 1963-64 and 1964-65 Zurich policies.

On the other hand, the court disregards portions of Stetina's testimony that Coltec offers in support of its motion for summary judgment where the court must determine Stetina's credibility. Coltec asserts that Stetina's testimony proves that the 1963-64 and 1964-65 Zurich

---

[12]Furthermore, the claims in the Environmental and Asbestos actions concern the activities of Fairbanks Morse and not Fairbanks Whitney.

policies were standard CGL policies and that the Zurich policies contained occurrence endorsements and no asbestos or pollution endorsements. However, Stetina reviewed the 1963-64 and 1964-65 Zurich policies more than thirty years ago. (Def. Resp. to Pl. Facts ¶ 68.) Furthermore, during his deposition, Stetina could not recall the the number, type and form of endorsements included in the Zurich policies. (*Id.* ¶¶ 68-69.) Coltec, however, produces Stetina's declaration to assert that the Zurich policies were written on Zurich's CGL policy forms and contained occurrence endorsements and no asbestos or pollution endorsements. (Pl. Ex. 154, Stewart Decl. ¶¶ 11-12, 15, 31, 32.) What Stetina attests to versus what he is deposed to demonstrates that there is a credibility issue concerning Stetina's ability to recollect the material terms and conditions of the Zurich policies. Therefore, the court disregards Stetina's declaration concerning these facts for purposes of ruling on Coltec's motion for summary judgment. Nevertheless, the court finds that the other secondary evidence offered by Coltec is sufficient to show that the Zurich policies provided, at a minimum, standard CGL coverage and contained an occurrence endorsement and no asbestos or pollution endorsement.

In sum, Stetina's testimony along with the corroborating evidence supports a finding that Zurich defended Coltec against bodily injury and property damage claims pursuant to the 1963-64 and 1964-65 Zurich policies.

# CONCLUSION

Based on the preponderance of the evidence and for the reasons set forth above, the court finds as follows:

(1) the Zurich policy form designated 916-F constitutes the material terms and conditions of the 1959-60, 1960-61 and 1961-62 Zurich policies (Policy Nos. 8055900, 8263000, and 8306800);

(2) the Zurich policy form designated 919-F constitutes the material terms and conditions of the 1962-63, 1963-64 and 1964-65 Zurich policies (Policy Nos. 8261650, 8359650, and 8448350);

(3) the 1961-62, 1962-63, 1963-64 and 1964-65 Zurich policies contained the standard Zurich "occurrence endorsement";

(4) the effective periods and limits of the respective Zurich policies are: Policy No. 8055900, July 1, 1959 to July 1, 1960, $1 million for bodily injury (person, accident or aggregate) and $1 million for property damage (accident or aggregate); Policy No. 8263000, July 1, 1960 to July 1, 1961, $1 million for bodily injury (person, accident or aggregate) and $1 million for property damage (accident or aggregate); Policy No. 8306800, July 1, 1961 to July 1, 1962, $2 million for bodily injury and property damage (occurrence or aggregate); Policy No. 8261650, July 1, 1962 to July 1, 1963, $2 million for bodily injury and property damage (occurrence or aggregate); Policy No. 8369650, July 1, 1963 to July 1, 1964, $2 million for bodily injury and property damage (occurrence or aggregate); and Policy No. 8448350, July 1, 1964 to July 1, 1965, $2 million for bodily injury and property damage (occurrence or aggregate); and

(5) the Zurich policies contained no endorsement that would limit or defeat coverage for asbestos or pollution claims.

The current phase on the Zurich policies' existence, terms and conditions is concluded. The parties and the court will proceed to address the next phase, which concerns whether the Zurich policies cover Coltec's environmental and asbestos claims.

## ORDER

The court grants summary judgment in favor of Coltec [Case No. 99 C 1087 (#132-1); Case No. 99 C 3192 (#0-1)]. As status hearing is set for Monday, November 4, 2002 at 9:30 a.m. to set a scheduling order for the next phase of the instant litigation.

ENTER: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: September 30, 2002