# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1087 | **DATE** | 1/29/2004 |
| **CASE TITLE** | Coltec Industries, Inc. vs. Zurich Insurance Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Zurich's Motion for Partial Summary Judgment on Choice of Law is denied. Zurich's Motion to Strike Declarations is denied (#195). Coltec's Motion for Summary Judgment on Zurich's Violation of its Duty to Defend, Estoppel, and Choice of Law is granted. (#186) Coltec's claim for attorneys' fees and costs shall be made by motion pursuant to Federal Rule of Civil Procedure 54.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | **JAN 3 0 2004** | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | *G.* | 217 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/29/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAN 3 0 2004

| | |
|---|---|
| COLTEC INDUSTRIES INC., | ) Case No. 99 C 1087 |
| Plaintiff, | ) |
| | ) consolidated with |
| vs. | ) |
| | ) Case No. 99 C 3192 |
| ZURICH INSURANCE COMPANY, | ) |
| | ) Judge Joan H. Lefkow |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Coltec Industries Inc. ("Coltec"), seeks coverage for environmental and asbestos claims under six comprehensive general liability ("CGL") insurance policies issued by defendant Zurich Insurance Company ("Zurich") between July 1, 1959, and July 1, 1965. Coltec is engaged primarily in the business of manufacturing precision engineered products. It is incorporated under the laws of Pennsylvania and its principal place of business is in Chapel Hill, North Carolina. Zurich is engaged in the business of selling insurance policies. It is incorporated under the laws of Switzerland and its principal place of business is Zurich, Switzerland. More than $75,000 is in controversy. This court, therefore, has jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2). Before the court are Zurich's Motion for Partial Summary Judgment on Choice of Law and Coltec's Motion for Summary Judgment on Zurich's Violation of Its Duty to Defend, Estoppel and Choice of Law. For the reasons set forth herein, the court denies Zurich's Motion and grants Coltec's Motion.

**Background**

In 1951, Leopold Silberstein acquired control of the Pennsylvania Coal & Coke Corporation ("PC&C"), a coal company incorporated in Pennsylvania with its headquarters in Philadelphia. Upon gaining control of PC&C, Silberstein moved the company's headquarters to New York. In the following years, Silberstein converted PC&C from a coal company to a diversified industrial conglomerate, acquiring over eighteen companies. In recognition of the diversified scope of the business, PC&C changed its name to Penn-Texas Corporation ("Penn-Texas") in 1954.

One of the largest companies Penn-Texas targeted for acquisition was Fairbanks Morse & Co. ("Fairbanks Morse"), a manufacturer of pumps, scales, generators, and locomotives that had been headquartered in Chicago since the nineteenth century. In 1958, Penn-Texas gained control over Fairbanks Morse, but Fairbanks Morse remained a separately operated company.[1] In 1959, Penn-Texas changed its name to Fairbanks Whitney Corporation ("Fairbanks Whitney").

In 1959, Fairbanks Whitney consolidated its general liability insurance program and that of its subsidiaries and affiliates. After a competitive bidding process, Zurich was selected as the general liability carrier for Fairbanks Whitney and Fairbanks Morse. Zurich issued six CGL policies (Policy Nos. 8055900, 8263000, 8306800, 8261650, 8359650, 8448350)(collectively referred to as the "Zurich Policies") to Fairbanks Morse and Fairbanks Whitney from July 1, 1959, to July 1, 1965. (Coltec L.R. 56.1 ¶ 8.)

---

[1] From 1959 to 1964, Moody's Report continued to list Fairbanks Morse separately while subsuming Fairbanks Whitney's other subsidiaries under the Fairbanks Whitney listings. (Coltec Exs. 39, 49, 50, 51, 52, 53.)

Fairbanks Morse remained a Fairbanks Whitney affiliate throughout the early 1960s. In 1963, Fairbanks Morse moved its headquarters to Yonkers, New York, and it became a Fairbanks Whitney wholly-owned subsidiary in 1964. That year, Fairbanks Whitney changed its name to Colt Industries, Inc. ("Colt"). In 1990, Colt changed its name to Coltec.

Coltec's claims against Zurich arise from environmental contamination resulting from waste disposal activities of Fairbanks Morse at twelve sites around the United States. Coltec was first served with a complaint alleging property damage resulting from environmental contamination in March, 1991, in an action entitled *55 Motor Avenue Co. et al.* v. *Industrial Finishing Corp.*, CV-91-0968 (E.D.N.Y. March 19, 1991)(the "*55 Motor Avenue* suit"). The complaint alleges that Coltec's predecessors were responsible for the disposal of hazardous substances at the Liberty Industrial Finishing site in Farmingdale, New York (the "Liberty site"), from the early 1930s until 1981, resulting in immediate and ongoing environmental property damage. On May 17, 1991, Coltec notified Zurich of the *55 Motor Avenue* suit and requested that Zurich acknowledge the claim under two excess policies not at issue in this litigation. On September 12, 1991, Coltec forwarded the *55 Motor Avenue* complaint to Zurich and requested that Zurich acknowledge the claims under the last four Zurich Policies. Coltec has since notified Zurich of and requested defense and indemnity coverage pursuant to the Zurich Policies at a number of additional sites. However, neither Coltec nor Zurich was able to locate a copy of the Zurich Policies, and Zurich therefore refused to acknowledge any obligation to Coltec under the policies.

On November 18, 1998, Zurich sued Coltec and over twenty insurance carriers in Illinois state court seeking (1) a declaration that Zurich had no coverage obligation under the Policies

3

with regard to the environmental claims against Coltec, and (2) "contribution" from the defendant insurers for any sums Zurich was ultimately required to pay Coltec. In February, 1999, before Zurich served the state court complaint, Coltec filed Civil Action No. 99 C 1087 (the "Environmental Action") in the Northern District of Illinois, alleging breach of contract and seeking a declaration of rights that Zurich was required to defend and indemnify Coltec in the underlying Environmental Action. After Coltec moved to dismiss the state court action under Illinois' "targeted tender" rule,[2] Zurich dismissed those claims against all insurers except American Motorists Insurance Company, an Illinois resident that had insured Fairbanks Morse immediately before Zurich. Coltec removed the state court action to this court on the basis of diversity jurisdiction. The court denied Zurich's motion to remand, and Zurich voluntarily dismissed the state action.

In the meantime, over 2,000 claimants sued Coltec, alleging that they sustained bodily injury, sickness and diseases as a result of exposure to asbestos products that Fairbanks Morse either manufactured or used. Coltec requested that Zurich assume its defense in these lawsuits under the Zurich Policies but Zurich refused. On May 13, 1999, Coltec filed Civil Action No. 99 C 3192 (the "Asbestos Action") in the Northern District of Illinois, alleging breach of contract and seeking a declaration of rights that Zurich was required to defend and indemnify Coltec in the underlying asbestos actions. On October 12, 1999, Zurich agreed to "participate in Coltec's defense subject to a full and complete reservation of rights" with respect to 92 of the underlying

---

[2]This rule permits an insured covered by more than one insurance policy to seek a defense and indemnification from any one of its insurers and prevents that insurer from seeking contribution from other insurers. *See Cincinnati* v. *West Am. Ins. Co.*, 701 N.E. 2d 499, 503 (Ill. 1998); *John Burns Constr. Co.* v. *Indiana Ins. Co.*, 727 N.E. 2d 211, 216 (Ill. 2000).

4

asbestos lawsuits. However, Zurich has not assumed Coltec's defense in any of the asbestos suits, nor has Zurich paid Coltec for any of the defense costs that Coltec has incurred in defending the suits.

On October 18, 1999, the court found the Environmental Action and the Asbestos Action related and consolidated them. The court divided the action into two phases, with Phase I addressing the existence of the Zurich Policies and their terms and conditions and Phase II addressing whether the Zurich Policies cover Coltec's environmental and asbestos claims. On September 30, 2002, the court issued an order finding that Zurich became Fairbanks Whitney's CGL insurance carrier in 1959, that the Zurich Policies were "master" policies covering all Fairbanks Whitney concerns, that the Zurich Policies were standard form CGL policies containing "duty to defend" clauses and broad bodily injury and property damage coverage grants, and that the policies contained no endorsement that would limit or defeat coverage for asbestos or pollution claims. *Coltec Industries Inc.* v. *Zurich Insurance Co.*, No. 99 C 1087, 2002 WL 31185789, at *12, 15-16 (N.D. Ill. Sept. 30, 2002)("Phase I Order"). The court now turns to Phase II addressing choice of law and whether the Zurich Policies cover Coltec's environmental and asbestos claims.

## Discussion

### I. Choice of Law

Zurich asserts that New York law applies to Phase II, and that under New York law there is no coverage under the Zurich Policies for a variety of reasons, including late notice. Coltec asserts that Illinois law applies, and that under Illinois law Zurich is estopped from presenting any coverage defenses.

5

Before undertaking a choice-of-law analysis, the court must determine whether there is in fact a conflict between New York law and Illinois law that would make a difference in the outcome of the case. *See Morris B. Chapman & Assoc., Ltd. v. Kitzman*, 307 Ill. App. 3d 92, 101, 716 N.E. 2d 829, 838 (Ill. App. 5th Dist. 1999). At least one court has found, on similar facts, that there is a conflict between Illinois law and New York law on the issue of whether late notice constitutes a defense against insurance coverage claims. *Household Intl., Inc. v. Liberty Mut. Ins. Co.*, 321 Ill. App. 3d 859, 868-69, 749 N.E.2d 1, 8-9 (Ill. App. 1st Dist. 2001). In *Household*, the court determined that, under Illinois law, an insurer may be estopped from asserting the late notice of occurrence or suit as a defense to coverage under a policy when it has breached its duty to defend by failing to either defend its insured under a reservation of rights or promptly litigate the matter in a declaratory judgment action. *Id.* (citing *Employers Ins. v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 152-53, 708 N.E. 2d 1122, 1135-36 (1999)). The court found that New York law contained no such rule. *Id.; see also Aetna Cas. & Sur. Co. v. Lumbermens Mut. Cas. Co.*, 598 N.Y.S. 2d 924, 926 (N.Y. Sup. Ct. 1993)(New York law does not excuse failure to give timely notice of claim because of belated discovery of policy, especially when discovery took place more than two years after incident); *Olin Corp. v. Ins. Co. of North America*, 966 F. 2d 718, 724 (2d Cir. 1992)(long delay in notice inexcusable as a matter of New York law because "lack of knowledge of an insurance policy does not excuse a delay in notification of an occurrence").

Accordingly, because a conflict exists and because none of the Zurich Policies contains an express choice-of-law provision, the Court must apply the general choice-of-law rules of the forum state, Illinois, to determine which state's law should apply. *Land v. Yamaha Motor Corp.*,

272 F.3d 514, 516 (7th Cir. 2001). The court, not the jury, is responsible for making any factual determinations necessary to resolve the choice-of-law issue based on a preponderance of the evidence standard. *See Chance* v. *E.I. du Pont De Nemours & Co.*, 57 F.R.D. 165, 171 (E.D.N.Y. 1972)(judge determines facts for choice of law purposes by preponderance of evidence standards); *Gramercy Mills, Inc.* v. *Wolens*, 63 F.3d 569, 571 (7th Cir. 1995)("Judges, not juries, decide questions of law, such as choice of law issues.").

When addressing choice-of-law issues, Illinois generally applies the "most significant contacts" analysis embodied in the American Law Institute's Restatement (Second) of Conflict of Laws (1971). *Chapman*, 307 Ill. App. 3d at 99, 716 N.E. 2d at 836-37. Under this analysis, "insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act giving rise to the contract, the place of performance, or other place bearing a rational relationship to the general contract.'" *Lapham-Hickey Steel Corp.* v. *Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 526-27, 655 N.E. 2d 842, 845 (Ill. 1995)(quoting *Hofeld* v. *Nationwide Life Ins. Co.*, 59 Ill. 2d 522, 528, 322 N.E. 2d 454, 458 (Ill. 1975). These factors "are not all of equal significance. The weight accorded to each depends on the issue involved." *Emerson Elec. Co.* v. *Aetna Casualty & Surety Co.*, 319 Ill. App. 3d 218, 232, 743 N.E. 2d 629, 640 (Ill. App. 1st Dist. 2001).

Zurich contends that the insured's domicile, which it equates with the state where the insured is headquartered, is the most significant of the *Lapham-Hickey* factors in multi-state insurance coverage disputes. (Zurich's Mem. in Support of Mot. for Partial Summ. J., at 10.) Thus, because it is clear that Fairbanks Whitney was headquartered in New York during the

7

period in question, Zurich argues that New York law should apply to the instant case. In support of this position, Zurich relies on the Illinois appellate court's statement in *Emerson* that the significance of "the place of delivery, the place of the last act giving rise to a contract, and the place of performance . . . is minor compared to the element of domicile. Given the facts of this case, we conclude that the role of the domicile of the insured should be a dominant one." *Id.* at 234-35, 743 N.E. 2d at 641-642.

Zurich's argument fails for two reasons. First, under Illinois law, a corporation is domiciled for choice-of-law purposes only in the state in which it is incorporated. A corporation "can have but one legal residence, and that must be within the state or sovereignty creating it. . . . *The mere fact that a corporation has its principal office in a particular state, does not make it a resident of that state.*" *Leblanc* v. *E.D. Searle & Co.*, 178 Ill. App. 3d 236, 238, 533 N.E. 2d 41, 42-43 (Ill. App. 1st Dist. 1988)(emphasis in original); *see also Hollins* v. *Yellow Freight Sys., Inc.*, 590 F. Supp. 1023, 1026 (N.D. Ill. 1984)("Under [Illinois] common law, a corporation is considered a resident only of the state(s) in which it is incorporated, and not of all the states in which it is licensed to do business or subject to the jurisdiction of the local courts."). It is undisputed that Fairbanks Whitney was incorporated in Pennsylvania. Thus, Zurich's argument that New York should apply because Fairbanks Whitney was domiciled in New York is erroneous.

Notwithstanding this error, Zurich's argument also fails because it relies on a superficial reading of *Emerson*. In *Emerson*, Emerson Electric Company ("Emerson"), a conglomerate incorporated in Missouri and headquartered in St. Louis, Missouri, but with subsidiaries in several states, sought CGL coverage under policies issued decades before for environmental

8

contamination at multiple sites throughout the United States. *Id.* at 223-25, 743 N.E. 2d at 634-36. Emerson sought application of Illinois law to the coverage dispute because it claimed that the policies were "negotiated, sold and delivered largely through brokers in Chicago." *Id.* at 233, 743 N.E. 2d at 641. The court rejected Emerson's argument, finding that the record did not specify "with any clarity where each phase of the negotiation of these policies took place, nor the location of the branch offices that participated in these negotiations." *Id.* at 237, 743 N.E. 2d at 644. In part because of this ambiguity, the court determined that the insured's corporate headquarters in St. Louis was the most important factor in the choice-of-law analysis and held that Missouri law applied.

However, in reaching this conclusion the court did not create a bright-line rule that the insured's headquarters is "decisive in multi-state insurance coverage disputes," as Zurich contends. Rather, the court found that the location of Emerson's headquarters was the most significant factor in the analysis *because* Emerson's risk management department was located there. As the court explained, "the domicile of Emerson is not simply a passive, coincidental factor, where all other significant factors occurred elsewhere. Rather, Emerson's domicile played an active, dominant and dynamic role in the procurement of these policies." *Id.* at 235, 743 N.E. 2d at 642. The record showed that "the procurement of insurance for both Emerson and its subsidiaries was largely coordinated out of Emerson's corporate headquarters in St. Louis." *Id.* Specifically, Michael Zimmer, Emerson's "corporate insurance manager" and later "head of Emerson's newly formed insurance risk management department" worked at Emerson's headquarters in St. Louis. It was from there that he negotiated and procured insurance coverage for Emerson and its subsidiaries, served as the "point person" for gathering information relating

9

to the entities that were to be covered under the policies, and paid premiums on the policies. *Id.* On these facts, the court concluded that "the location of Emerson's headquarters in Missouri clearly merits significant weight in the analysis," because "Emerson's corporate treasury department and its risk management department, both located in St. Louis, figured so prominently in the procurement of insurance not only for Emerson but also for its subsidiaries." *Id.* at 236, 743 N.E. 2d at 642.

In the instant case, a preponderance of the evidence shows that the New York headquarters of Fairbanks Whitney was "simply a passive, coincidental factor," while Fairbanks Morse's Chicago office "played an active, dominant and dynamic role" in the procurement of the Zurich Policies. First, the evidence in the record demonstrates that Robert Myers served as the Insurance Manager for all Fairbanks Whitney and Fairbanks Morse subsidiaries and divisions when the Zurich Policies were purchased. (Coltec L.R. 56.1 ¶ 77.) For example, when asked if there were "any corporate functions that were being conducted on behalf of the entire company, but being so conducted by either a subsidiary or an affiliated company instead of the holding company [Fairbanks Whitney]," former Coltec executive Andrew Hilton stated,

> Yeah. Well, the insurance is the most obvious example. Fairbanks Morse had had an insurance manager, and when [Fairbanks Morse and Fairbanks Whitney] were put together, just – that was the biggest insurance buyer. He was given coverage of the other divisions.

(Hilton Dep., at 40:12-22; *see also id.*, at 45:18-46:5; Hilton Decl., at ¶ 10; Stetina Decl. I, at ¶ 3, 6, 8; Stetina Decl. II, at ¶ 3-5.)[3]  In addition, there is no evidence in the record of any other

---

[3]Zurich has moved to strike the declarations of Hilton, a former Coltec executive, and Stetina, a former Coltec Insurance Manager, because "post-deposition affidavits and declarations are highly disfavored in the Seventh Circuit." (Zurich's Mot. to Strike, at 2.) However, the cases that Zurich cites in support of its motion make clear that the Seventh Circuit does not "disfavor" declarations that "merely clarify[] or augment[]" deposition testimony. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1998). What are disfavored are declarations and affidavits

Insurance Manager in the entire Fairbanks Whitney/Fairbanks Morse organization.[4] Zurich's Phase I expert witness and Phase II Rule 30(b)(6) witness, Rudolph Zwolfer, confirmed this when he was asked if Zurich was aware of any evidence that would support the conclusion that, during the period from 1959 to 1965, any person other than Myers served as an Insurance Manager for either Fairbanks Whitney or Fairbanks Morse. Zwolfer replied, "There were no other names." (Zwolfer Dep. II, at 49: 3-8.)

As Insurance Manager, Myers would have played an active, dominant and dynamic role in procuring the Zurich Policies. Zurich witness Norman Stern stated that, according to the "universally accepted meaning," an Insurance Manager is "[s]omeone who is responsible for acquiring insurance, maintaining insurance and handling all matters that pertain to insurance for his company." (Stern Dep. I, at 57:23-58:6.) Zwolfer testified that, based on his over thirty years of experience, Insurance Managers "always ha[d] the authority to make a decision to purchase a program of comprehensive general liability insurance on behalf of their employer." (Zwolfer Dep. II, at 175:12-19.)

Finally, it is clear that Myers was located at Fairbank's Morse's Chicago headquarters when at least the first four Zurich Policies were issued. The Martindale-Hubbell Law Directory lists Myers' office as 600 S. Michigan Avenue, Fairbank's Morse's Chicago office, for the years

---

"offered to contradict the affiant's testimony," *Beckel* v. *Wal-Mart Associates, Inc.*, 301 F.3d 621, 623 (7th Cir. 2002), or offered to "explain away concessions" made in a deposition. *Russell*, 51 F.3d at 68. Zurich does not point to a single contradiction or inconsistency between the witnesses' sworn declarations and their deposition testimony. Thus, the court denies Zurich's motion to strike.

[4]Zurich speculates that Dana Hayward, "a Whitney employee, had various insurance duties during the 1960s, and was involved in procuring insurance for Coltec before January 1, 1963." (Zurich's Mem. in Support of Mot. for Partial Summ. J., at 18.) However, the record indicates that Dana Hayward was not a "Whitney employee" prior to 1963 but rather Assistant Treasurer of Fairbank's Whitney's subsidiary, Colt's Firearms Company, in West Hartford, Connecticut, and that he only handled life and health insurance and pension benefits, not CGL insurance. (Hilton Decl. ¶ 11; Hilton Dep., at 45:18-49:24.)

11

1958-1964. (Coltec Exs. 70-84.) Hilton states in his declaration that Myers "had operated out Fairbank's Morse's corporate offices in Chicago until some time in late 1962, and . . . in 1963 he was commuting between Yonkers and Chicago. (Hilton Decl. ¶ 10.) Nothing in the record suggests that Myers worked anywhere except Chicago before 1962.

Nevertheless, Zurich argues that at least one of the *Lapham-Hickey* factors, the place of delivery of the contract, "is presumed to point to the insured's headquarters in the absence of clear proof to the contrary." (Zurich's Memo. in Supp. of Mot. for Partial Summ. J., at 10.) In support of its contention, Zurich cites *Emerson*: "In the absence of proof as to where the policy was delivered it is presumed that delivery took place at the insured's residence." 319 Ill. App. 3d at 233, 743 N.E. 2d at 640. This presumption is undermined in the instant case, however, by the testimony of Zurich's own witness, Rudolph Zwolfer. Zwolfer testified that, as a matter of general practice, insurance policies are typically delivered to the risk management department of an insured company. (Zwolfer Dep. II, at 135: 11-14.) Because the Insurance Manager was located in Fairbanks Morse's Chicago office, and there is no evidence of any other "risk management office" in the Fairbanks Whitney family of companies, the court presumes that Zurich followed the "general practice" and delivered the policies to Myers in Chicago.

Despite the foregoing evidence that Fairbank's Morse's Chicago office played an active, dominant, and dynamic role in procuring the Zurich Policies, Zurich argues that the court should still apply New York law because New York was the "longstanding, open and notorious location of Fairbanks Whitney's corporate headquarters." (Zurich's Response to Coltec's Mot. for Summ. J., at 7.) Zurich argues that applying Illinois law to this dispute would "trample[] on the reasonable expectations of persons who relied on public facts and an entity that continuously,

12

over a period of over 40 years, held itself out as being located in a particular place" and "open a Pandora's box of confusion and uncertainty." Zurich continues, "No one could ascertain the law applicable to their dealings with an entity like Coltec– on facts like those of this case–without engaging in a fact-intensive investigation into obscure, latent and potentially hidden conditions, such as the existence of a *de facto* 'insurance department,' embodied in the person of one man, in a foreign jurisdiction." (*Id.*, at 9.) Obviously, a sophisticated contracting party like Zurich could easily avoid this Kafkaesque scenario by including a choice-of-law provision in its policies. *See Liggett Group Inc.* v. *Affiliated FM Ins. Co.*, 788 A.2d 134, 143 (Del. Super. Ct. 2001)("[I]t ill behooves sophisticated contracting parties like insurer, who fail to enter a choice of law provision in a contract, to argue that they are suffering from uncertainty or that the choice of a particular jurisdiction's law does not comport with their expectations upon contracting."). In the absence of a choice-of-law provision in the contract, the parties' expectations are only of marginal importance to the choice-of-law analysis on facts like those in this case. As the Restatement (Second) of Conflicts explains,

> Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof. By and large, it is for the parties themselves to determine the nature of their contractual obligations. . . . If the parties [neither spell out these obligations in the agreement nor, as a short-hand device, select the local law of a given state], the resulting gap in their contract must be filled by application of the relevant rule of contract law. . . . What is important for present purposes is that a gap in a contract usually results from the fact that the parties never gave thought to the issue involved. In such a situation, the expectations of the parties with respect to that issue are unlikely to be disappointed by application of the gap-filling rule of one state rather than that of another state. Hence with respect to issues of this sort, protection of the justified expectations of the parties is unlikely to play so significant a role in the choice-of-law process.

13

Restatement (Second) of Conflicts § 188 cmt. b (1971). Furthermore, Zurich's argument that its reasonable expectations will be undermined by the application of Illinois law to this dispute rings hollow given that Zurich initially filed suit against Coltec in Illinois state court.

Given the facts of record, the court concludes that Illinois had the most significant contacts with the Zurich Policies and therefore that Illinois law applies to the instant case. This conclusion holds despite the fact that Fairbanks Morse relocated its offices, including its insurance office, to Yonkers, New York, in 1963, before the final two Zurich Policies were issued. The 1963-64 and the 1964-65 Zurich Policies contained material terms and conditions identical to the 1962-63 Zurich Policy. Phase I Order, at *15. As Judge Easterbrook explained in *Lee* v. *Interstate Fire & Cas. Co.*, 86 F. 3d 101, 103 (7th Cir. 1996), "Two policies with identical language covering the same risk should have identical effects. . . . We do not think that Illinois would apply multiple bodies of law to a single disputed term. That is in the end what *Lapham-Hickey* stands for: in that case, a single policy covered risks in many states, so applying the law of the delivery state produced a consistent interpretation." To ensure a consistent interpretation of the Zurich Policies, the court holds that Illinois law applies to all of the Zurich Policies.

**II. Zurich's Duty to Defend**

An insurer has two distinct sets of obligations under a CGL policy–the duty to defend and the duty to indemnify. The insurer's duty to defend is broader than its duty to indemnify. *See Conway* v. *Country Casualty Ins. Co.*, 92 Ill. 2d 388, 394, 442 N.E. 2d 245, 247 (Ill. 1982). The existence of a duty to defend is governed by the "four corners" rule:

> To determine whether an insurer has a duty to defend, the court must consider the allegations in the underlying complaint and compare them to the relevant provisions of the insurance policy. If the court determines that

14

> these allegations fall within or *potentially* within the policy's coverage, the
> insurer has the duty to defend the insured against the underlying
> complaint. The underlying complaint must be construed liberally so that
> all doubts are resolved in favor of the insured.

*Westchester Fire Ins. Co.* v. *G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 632-33, 747 N.E.

2d 955, 964 (Ill. App. 1st Dist. 2001)(internal citations omitted and emphasis added).

"The threshold that a complaint must satisfy to present a claim of potential coverage is

low." *LaGrange Mem'l Hosp.* v. *St. Paul Ins. Co.*, 317 Ill. App. 3d 863, 869, 740 N.E. 2d 21, 27

(Ill. App. 1st Dist. 2000). An insurer must defend "even if the allegations are groundless, false, or

fraudulent." *U.S. Fidel. & Guar. Co.* v. *Wilkin Insulation Co.*, 144 Ill. 2d 64, 73, 578 N.E. 2d

926, 930 (Ill. 1991). Indeed, "[t]he complaint need not allege or use language affirmatively

bringing the claims within the scope of the policy, as the question of coverage should not hinge

exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action."

*Roman Cath. Diocese of Springfield* v. *Maryland Cas. Co.*, 139 F.3d 561, 567 (7th Cir. 1998).

"An insurer," therefore, "may not justifiably refuse to defend an action against its insured unless

it is *clear* from the face of the underlying complaints that the allegations fail to state facts which

bring the case within, or potentially within, the policy's coverage." *Wilkin,* 144 Ill. 2d at 73, 578

N.E. 2d at 930. Moreover, the insurer must defend the entire action against its insured if there is

a possibility that any of the allegations may bring the case within the coverage grant. *Id.*

### A. The Underlying Asbestos Complaints

Each of the asbestos complaints alleges that the plaintiffs contracted a physical injury or

disease as a result of exposure to asbestos-containing products manufactured by Fairbanks

Morse. The complaints all fall into one of three categories: the complaint alleges exposure to

15

asbestos, for which Fairbanks Morse is responsible, either (1) solely during the 1959-1965 period,[5] (2) during a period broader than but including the 1959-1965 time period,[6] or (3) during an unspecified period that could include the 1959-1965 time period.[7] These allegations of bodily injury in the complaints are sufficient to trigger Zurich's duty to defend Coltec under the Zurich Policies. In *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 118 Ill. 2d 23, 45, 514 N.E. 2d 150, 159-60 (Ill. 1987), the Illinois Supreme Court established that claims of physical harm based on asbestos exposure are covered by the "bodily injury" provisions in the standard-form "accident" and "occurrence" CGL policies identical to the Zurich Policies. Because all three categories of complaints permit proof that some portion of the claimant's asbestos-related injury occurred during the period covered by the Zurich Policies, Zurich has a duty to defend those actions.

### B. The Underlying Environmental Complaint

The *55 Motor Avenue* complaint alleges that Coltec's predecessors (1) disposed of hazardous materials at the Liberty site from 1955 to 1957, which caused and continues to cause environmental damage to the plaintiffs, and (2) "maintained control over and responsibility for the use of property from 1957 until 1981" during which time further waste disposal took place. (Coltec Ex. 102.) It is well established under Illinois law that both the "accident" and "occurrence" coverage formulations such as those contained in the Zurich Policies provide coverage for property damage due to gradual, long-term environmental pollution. *See, e.g.*,

---

[5] *See, e.g., Quincy Adams* v. *Owens-Corning and Fairbanks Morse Pump Company*, No. 50, 703 (Louisiana)(alleging exposure dates from 1961-1965)(Coltec Ex. 92).

[6] *See, e.g., Joyce* v. *Fairbanks-Morse*, 01-C-717 (New Hampshire)(alleging exposure dates from 1950-1981)(Coltec Ex. 93).

[7] *See, e.g., Jasper Abbott* v. *Fairbanks-Morse*, 01-C-54M (West Virginia)(does not allege exposure dates)(Coltec Ex. 94).

16

*American States Ins. Co.* v. *Koloms*, 177 Ill. 2d 473, 485-89, 687 N.E.2d 72, 77-80 (Ill.

1997)(noting that courts have interpreted both "caused by accident" and "caused by occurrence"

CGL coverage grants "to cover damages resulting from long-term, gradual exposure to

environmental pollution."). Moreover, Illinois court have adopted the "continuous trigger"

approach in environmental pollution cases:

> Environmental pollution does not stop and start in discrete time periods.
> When pollutants are released or discharged the damage is immediate.
> There is a continuing process. If we were to pour black ink into white
> milk we could not find a time when the coloring process did not occur.
> "Under this theory, property damage is deemed to have occurred
> continuously for a fixed period, and every insurer on the risk at any time
> during the trigger period is jointly and severally liable to the extent of their
> policy limits[.]"

*Benoy Motor Sales, Inc.* v. *Universal Underwriters Ins. Co.*, 287 Ill. App. 3d 942, 948, 679 N.E.

2d 414, 418 (Ill. App. 1st Dist. 1997)(quoting *U.S. Gypsum Co.* v. *Admiral Ins. Co.*, 268 Ill. App.

3d 598, 644, 643 N.E. 2d 1226, 1256 (Ill. App. 1st Dist. 1994). Because the *55 Motor Avenue*

complaint does not clearly foreclose the potential that environmental damage occurred in part

during the periods covered by the Zurich Policies, Zurich is obligated to defend Coltec with

regard to the *55 Motor Avenue* suit.

## III. Zurich's Coverage Defenses

Zurich argues that it has no duty to defend Coltec in the *55 Motor Avenue* suit because

Coltec did not notify Zurich of any claim arising out of contamination of the Liberty site until

several months after the *55 Motor Avenue* suit was filed, despite having known about

environmental problems at the Liberty site since the mid-1970s. Late notice constitutes a defense

against coverage obligations under New York law. However, under Illinois law, an "insurer

17

must take some action to adjudicate the issue of coverage or undertake to defend the insured under a reservation of rights, and it must take that action within a reasonable time of a demand by the insured." *Korte Constr. Co.* v. *American States Ins.*, 322 Ill. App. 3d 451, 458, 750 N.E.2d 764, 770 (Ill. App. 5th Dist. 2001). If an insurer fails to defend its insured or file a "prompt declaratory judgment action," it is estopped from raising policy defenses, including late notice. *Petersen Sand & Gravel, Inc.* v. *Maryland Cas. Co.*, 881 F. Supp. 309, 315 (N.D. Ill. 1995). Zurich's seven year delay in filing a declaratory judgment action cannot be considered "prompt" under Illinois law. *See Ehlco*, 186 Ill. 2d at 160, 708 N.E. 2d at 1139-40 (insurer estopped from raising policy defenses because it waited over one year to file a declaratory judgment action because 'it was searching for its policies"); *LaGrange Mem'l Hosp.*, 317 Ill. App. 3d at 872-73, 740 N.E.2d at 29 (two and a half months); *Central Mut. Ins. Co.* v. *Kammerling*, 571 N.E. 2d 806, 809-10 (10 months). Accordingly, Zurich is estopped from raising the defense of late notice.[8]

Zurich is also estopped from raising any other coverage defenses. Zurich argues, for example, that it should be excused from its duty to defend Coltec in the environmental claim because the Zurich Policies were lost and "it is difficult for an insurer to compare the allegations of a complaint with an undeniably lost insurance policy." (Zurich's Resp.to Coltec's Mot. for

---

[8]Zurich argues that Illinois courts consider four factors in deciding whether to excuse an insured's failure to give timely notice of an occurrence to an insurers: (1) the language of the policy's notice provision; (2) the insured's sophistication in the world of commerce and insurance; (3) the insured's awareness of a claim or suit as defined by the policy; and (4) once this awareness arises, the insured's diligence and reasonable care in ascertaining whether policy coverage is available. In support of this argument, Zurich cites *Northbrook Prop. & Cas. Ins. Co.* v. *Applied Systems Inc.*, 313 Ill. App. 3d 457, 466, 729 N.E. 2d 915, 922 (Ill. App. 1st Dist. 2000). Zurich argues that none of these factors excuse Coltec's tardy notice of the environmental claims at the Liberty site. Zurich fails to notice, or at least fails to mention, that *Northbrook* was a declaratory judgment action brought by an *insurer* less than one month after it was notified by the insured of a possible claim under the policy. Because the insurer promptly filed a declaratory judgment action, it was not estopped from raising late notice as a coverage defense.

18

Summ. J., at 10.) However, Zurich has conceded that the CGL policies it issued to Coltec's predecessors, like all standard CGL policies of the period, were "designed to automatically cover business operations . . . for all general liability hazards . . . unless specifically excluded by the exclusions of the policy or by endorsement." (Zur. Resp. to Coltec L.R. 56.1 ¶¶ 163-75, 178-81, 183-87.) Zurich also admits that it did not exclude coverage for liability claims arising from pollution injury during the 1959-65 time period. (*Id.* ¶ 182.) Thus, Zurich had all the information it needed to determine that the environmental claim potentially fell within the Policies' coverage. Even if an insurer believes its policies may not provide coverage for the policyholder's claims, it must either defend the policyholder subject to a reservation of rights or file a prompt declaratory judgment action to determine its coverage obligations. It may not simply "abandon its insured." *See Ehlco*, 186 Ill. 2d at 160, 708 N.E. 2d at 1139-40 (insurer estopped by waiting over a year to file a declaratory judgment action because it was "searching for its policies").

Finally, Zurich argues that the asbestos claims are moot because it has already agreed to participate in the defense of the asbestos claims. However, Zurich's "offer to 'participate' in the defense on a pro rata basis does not equate to an acceptance of defense with a reservation of rights." *LaSalle Nat'l Trust, N.A.* v. *Schaffner*, 818 F. Supp. 1161, 1171-72 (N.D. Ill. 1993)(citing *Raymark*, 118 Ill. 2d at 30, 514 N.E. 2d at 153). Zurich has not assumed Coltec's defense in any of the asbestos suits, nor has Zurich paid Coltec for any of the defense costs that Coltec has incurred in defending the suits. Thus, Zurich's agreement to "participate" in Coltec's defense against the asbestos suits does not cure its breach of its duty to defend.

## IV. Costs and Attorney's Fees

Zurich's refusal to provide a defense for Coltec under the Zurich Policies entitles Coltec to recover its attorney fees and costs in this action. Under Illinois law, as interpreted by the Seventh Circuit, "where an insurer breaches its duty to defend its insured and thereby forces the insured to bear the burden of initiating a declaratory judgment action against the insurer, the insured can recover attorneys' fees incurred from bringing the declaratory judgment action." *Green* v. *J.C. Penney Auto Insurance Co., Inc.*, 806 F.2d 759, 765-66 (7th Cir. 1986). As the Seventh Circuit pointed out, the contrary rule would be unfair to the insured because

> the insurer had contracted to defend the insured, and its failed to do so. It guessed wrong as to its duty, and should be compelled to bear the consequences thereof. If the [contrary rule were followed], it would actually amount to permitting the insurer to do by indirection what it could not do directly. That is, the insured has a contract right to have actions against him defended by the insurer, at its expense. If the insurer can force him into a declaratory judgment proceeding, and, even though it loses in such action, compel him to bear the expense of such litigation, the insured is actually no better off financially than if he had never had the contract right mentioned above.

*Id.* (quoting J. Appleman, 7C Insurance Law and Practice § 4691, at 283 (1979)). As a result of Zurich's breach of its duty to defend, Coltec was forced to file the asbestos declaratory judgment action and to defend Zurich's belated declaratory judgment action regarding its environmental liabilities. Thus, Coltec is entitled to its fees and costs.

## ORDER

For the reasons set forth below, Zurich's Motion for Partial Summary Judgment on Choice of Law is denied. Zurich's Motion to Strike Declarations is denied (#195). Coltec's Motion for Summary Judgment on Zurich's Violation of its Duty to Defend, Estoppel, and

Choice of Law is granted. (#186). Coltec's claim for attorneys' fees and costs shall be made by motion pursuant to Federal Rule of Civil Procedure 54 and Local Rule 54.3.

Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Date: January 29, 2004